1

2

3

4

5          IN THE UNITED STATES DISTRICT COURT FOR THE

6              EASTERN DISTRICT OF CALIFORNIA

7

8  LAVETTE SANDERS, individually and   )    CIV F 05-0469 AWI SMS
   as guardian ad litem for the estate of )
9  Michael Sanders,                     )    ORDER ON DEFENDANTS
                                        )    THE CITY OF FRESNO,
10         Plaintiff,                    )    JERRY DYER, RICHARD
                                        )    PAUL BROWN, ELOY
11     v.                               )    ESCARENO, JESSE HERRING
                                        )    and BEAU BURGER'S
12  THE CITY OF FRESNO a municipality;   )    MOTION FOR SUMMARY
   THE COUNTY OF FRESNO, a            )    JUDGMENT
13  municipality; TASER                 )
   INTERNATIONAL, Inc. a corporation   )    (Doc. No. 108)
14  doing business in California; JERRY  )
   DYER, an individual; RICHARD PAUL  )
15  BROWN, an individual, ELOY         )
   ESCARANEO, an individual, JESSE    )
16  HERRING, an individual, BEAU       )
   BURGER, an individual, and DOES 5  )
17  through 10, inclusive,              )
                                        )
18         Defendants.                  )
                                        )
19  _____ )

20  _____

21

22         This is a wrongful death case arising from a police encounter in the home of Michael and

23  Lavette Sanders.  Michael Sanders ("Michael") died and his widow Lavette Sanders ("Lavette"

24  or "Plaintiff") brought suit alleging a violation of 42 U.S.C. § 1983 and various state law causes

25  of action.  The Fresno Defendants, i.e. City of Fresno ("Fresno"), Fresno Police Chief Jerry Dyer

26  ("Chief Dyer"), Fresno Police Officers Richard Brown ("Brown"), Eloy Escareno ("Escareno"),[1]

27  Jesse Herring ("Herring"), and Beau Burger ("Burger"), move for summary judgment.

28
       _____
       [1]In the style of the case, this officer is identified as "Eloy Escaraneo."  On the cover of his deposition, he is
    identified as "Eloy Escarano."  In the briefing to this Court, both parties refer to him as "Eloy Escareno."  Of the
    three options available to the Court, it will follow the lead of the parties and use "Escareno."

Defendants's motion will be granted.

**FACTUAL BACKGROUND**[2]

On August 20, 2004, Michael Sanders became "real agitated," pulling out drawers and falsely accusing Lavette of having a boyfriend and not really being sick (Lavette has multiple sclerosis).  See DUMF No. 4; Sanders Depo. at 51-52, 73.  Michael Sanders was "strong" at 5'7" and 204 lbs.  DUMF No. 3.[3]  When Lavette attempted to call Michael's mother to calm him, Michael grabbed the phone and called 911.  DUMF No. 5.  Michael told the 911 operator that someone was trying to kill him while Lavette pleaded, "Why did you do that?"  DUMF No. 6.[4]  Responding Fresno officers were told of a possible "5150"[5] tearing up the house, with a female crying in the background.  See DUMF No. 7; Escareno Depo. at 99.

Upon arriving at the house, Herring testified that he heard yelling inside; Escareno testified that he did not hear screaming or crying and no officer told Escareno that they had heard crying.  See Herring Depo. at 171; Escareno Depo. at 120-121.  Once all officers had arrived (Herring, Escareno, Figueroa, Burger, and Brown),[6] the officers entered the porch, Herring knocked on the front door several times, at some point announced "Fresno PD," and the door was eventually opened.[7]  See Herring Depo. at 173; Sanders Deposition at 55, 59.  Herring had drawn

[2]"DUMF" refers to Defendants' Undisputed Material Fact.  "PUMF" refers to Plaintiff's Undisputed Material Fact.  Additionally, from the evidence presented, the timing of events is not entirely clear.  Since Plaintiff is the non-moving party, the Court will follow the sequence of events as described in Plaintiff's opposition.

[3]DUMF No. 2 reads, "In a similar cocaine related incident in 1993, Michael Sanders hit Lavette with a hammer and stabbed her with a knife."  Lavette contends that this evidence is inadmissible.  This evidence relates to events in 1993 and it does not appear that any of the responding officers were aware of this fact either prior to or during the tazing.  Cf. Figueroa Depo. at 77.  The Court will not consider DUMF No. 2 in resolving this motion.

[4]Lavette responds that the fact is "disputed as to 'pleaded.'"  However, Lavette herself used the term "plead" in her deposition.  See Sanders Depo. at 55:9-10.

[5]"5150" refers to California Welfare & Institutions Code § 5150, which allows a peace officer to take a person into custody who is a danger to himself or others due to mental illness.  See Cal. Welf. & Inst. Code § 5150.

[6]Brown is a sergeant and apparently was the ranking officer on the scene.  See Herring Depo. at 186.

[7]The Sanders home has a porch with a separate door.  The porch door was open when the officers arrived.  The officers were insider the porch, but outside the house, when they knocked on the house door.  Lavette indicated that the porch could hold about four to five people.  See Sanders Depo. at 60-61.

his taser prior to knocking a third time.  See Herring Depo. at 183.  Herring and Escareno were the front two officers, and Figueroa, Burger, and Brown were behind.  See Figueroa Depo. at 47-48.

When Lavette opened the door to the uniformed officers, Michael was naked and holding his arm around Lavette's torso from behind.[8]  See DUMF No. 8.  Michael was dripping wet (he recently had come out of the shower).  See Herring Depo. at 179; Sanders Depo. at 55.  Escareno and Herring testified that Michael appeared to be sweating profusely.  See Herring Depo. at 207; Escareno Depo. at 156.  Michael told the officers that they were not the police, even though they were uniformed.  See Sanders Depo. at 61.  Michael had a "crazed" or "wide eyed" look about him and was looking "beyond the officers."  See Escareno Depo. at 157; Herring at 179-180.  Michael was behaving in a paranoid and irrational fashion.  See Herring Depo. at 207; Figueroa Depo. at 63.  Herring testified that Michael said that the officers were not going to take Lavette away from him, see Herring Depo. at 179-80, and Escareno and Figueroa testified that Sanders said that the officers were there to kill him.  See Escareno Deposition at 157-158; Figueroa Depo. at 47.  Based upon their observations of Michael and Lavette, the officers suspected Michael to be under the influence of some stimulant and that they were facing a domestic violence situation or worse.  See DUMF No. 9;[9] Herring Depo. at 179; Escareno Depo. at 156.  Lavette held her stomach, was crying and visibly upset, and said nothing to the officers.  See Herring Depo. at 207; Brown Depo. at 151.

Escareno had drawn his gun, but holstered the weapon because he could see both of Michael's hands, and told Michael that they were not there to hurt him.  See Escareno Depo. at

---

[8]Lavette testified that Michael was naked, but Herring testified that Michael had a towel around him. Lavette's version will be credited.  Also, Plaintiff states that Michael was the one who answered the door, and cites to Herring's testimony and her own testimony.  However, page 55 of Lavette's testimony is prior to the officers's arrival and says nothing about who opened the door, and the cited portions of Herring's testimony, at best, indicate that both Michael and Lavette answered the door, with Michael standing behind Lavette.  In contrast, Lavette testified that she opened the door.  See Sanders Depo. at 60:18-19.  Plaintiff also states that Michael did not have his arm around Lavette, but Lavette herself so testified.  See Sanders Depo. at 59-60.  DUMF No. 8 is undisputed.

[9]Plaintiff states that this fact is disputed because the officers got this belief from of a "5150" from dispatch. However, the testimony cited by Plaintiff deals with what dispatch indicated.  The testimony cited by Defendants clearly indicate that their belief was based on the totality of the circumstances, especially Michael's own conduct.

1   160.  The officers told Michael that they were there to help.  See Sanders Depo. at 61.  Escareno

2   asked Michael to let Lavette go, held out his hand to Lavette, and asked Lavette to come with

3   him.  See Escareno Depo. at 158; Sanders Depo. at 64.  Michael did not let Lavette go.  See

4   Sanders Depo. at 64.  After officers asked Michael to "let [Lavette] go," Michael pulled Lavette

5   back inside, causing them both to fall.  DUMF No. 10.  Lavette and Michael both fell on their

6   backs.[10]  See Sanders Depo. at 73; Sanders Declaration at ¶ 6; see also Escareno Depo. at 171.

7   Lavette testified that she fell on Michael, and Escareno testified that it looked like Lavette was on

8   top of Michael.  See Escareno Depo. at 171; Sanders Depo. at 73.  The fall also caused a

9   separation of approximately two feet.  See Herring Depo. at 201, 249; see also Plaintiff's

10  Opposition at 4; Supplemental Opposition at 5.  Just prior to the fall and as Michael was pulling

11  Lavette back in, Brown yelled for a Taser to be used.[11]  See Brown Depo. at 161-162; see also

12  Escareno Depo. at 170-171.  Herring testified that he yelled at Michael to get down or words to

13  that effect, see Herring Depo. at 204-205, although other officers testified that Michael was on

14  his back.  E.g., Escareno Depo. at 171.  Herring's view of Michael was partially obscured by

15  Lavette during the fall.  See Herring Depo. at 201.  Michael was yelling that the officers were not

16  going to take Lavette away.  See Herring Deposition at 206.  Fearing for the safety of Lavette and

17  to prevent a potential hostage situation, officers rushed inside to take control of Michael and

18

19

20          [10]In supplemental briefing, Plaintiff indicates that there are inconsistencies among the officers' testimony

21  regarding how Michael and Lavette landed.  In particular, Herring testified that Michael fell on his knees.  See
    Herring Depo. at 200-201; but see Escareno Depo. at 171.  Lavette testified that Michael was on his back.  See

22  Sanders Depo. at 73; Sanders Dec. at ¶ 6.  As the non-moving party, the Court will accept Lavette's version of how
    she and Michael landed.  See Stegall v. Citadel Broad, Inc., 350 F.3d 1061, 1065 (9th Cir. 2003).

23          Also in supplemental briefing, Plaintiff states that there are inconsistencies between Herring and Escareno
    on the one hand, and Figueroa, Burger, and Brown on the other, regarding when and why the Sanderses fell.

24  Plaintiff argues that these differences must be resolved by the jury, but never argues how these differing versions
    affects her case or which version, if believed, would avoid summary judgment.  Nevertheless, Plaintiff acknowledges

25  she testified that she fell when Michael pulled her back because she lost her footing due to her multiple sclerosis;
    after she fell was when the first Taser was fired.  See Supplemental Opposition at 8; see also Sanders Depo. at 73;

26  Plaintiff's Opposition at 3-4.  This is consistent with Herring and Escareno.  That Brown, Figueroa, and Burger (who
    were behind Herring and Escareno on the porch) gave conflicting testimony compared to Herring, Escareno and

27  Lavette does not matter.  It is Lavette's version of events that will be accepted for this motion.  See Stegall, 350 F.3d
    at 1065.  Thus, the Sanderses fell and then the first Taser was fired.

28
            [11]Brown testified that he expected one officer to taze Michael.  See Brown Depo. at 164.

separate him from Lavette.  See DUMF No. 11.[12]

Herring then fired his Taser at Michael and hit him in the upper body.  See Herring Depo. at 206-207, 215.  From the time Lavette opened the door to the time Herring fired his Taser, Herring estimated that about a minute passed.  See Herring Depo. at 214.  Prior to Herring deploying his Taser, Lavette looked back at Michael and did not see him grabbing for her. See Sanders Declaration at ¶ 6.[13]  Herring did not brandish the Taser by producing an electric "crackle" prior deploying it, nor did he tell Michael that he would be tazed if he did not comply.[14] See Herring Depo. at 209, 212.  Herring testified that he first fired his Taser to keep Michael and Lavette separated, not to overcome resistance or prevent escape.  See Herring Depo. at 212-213. Herring also testified that he did not hear Brown request that a Taser be used.  See Herring Depo. at 251.  Herring shot Michael with the Taser and sent a five second cycle into him, but the Taser had no effect and Michael simply screamed.[15]  See Herring Depo. at 214, 220.  Because the Taser cycle had no effect on Michael (other than the scream), Herring took between 20 and 30 seconds to reload the Taser with a new cartridge.  See Herring Depo. at 218, 220.

---

[12]Plaintiff states that DUMF No. 11 is disputed in that Michael and Lavette were already separated by the fall.  However the separation was only two feet.  See Herring Depo. at 201, 249; see also Plaintiff's Opposition at 4; Supplemental Opposition at 5.  Also, whether it was reasonable to keep Michael and Lavette separated is a different from why the officers rushed inside.  Accepting this DUMF as undisputed does not establish the reasonableness of the officer's beliefs or conduct under the totality of the circumstances.  DUMF No.11 is undisputed.

[13]There is a dispute in this regard.  Herring testified that Michael was grabbing or reaching out for Lavette and at that point he deployed his Taser.  See Herring Depo. at 206, 212-213.  The Court requested additional briefing on this issue, to which Plaintiff supplied a declaration that is contrary to Herring's testimony.  Defendants argue that Lavette's declaration is inconsistent with her deposition testimony.  The Court does not see a sufficient tension that would justify disregarding the declaration.  Since Plaintiff is the non-moving party, her version of events will be credited.  Stegall, 350 F.3d at 1065.  For purposes of this motion, Michael was not grabbing for Lavette prior to Herring deploying his Taser.

[14]Plaintiff also states that the Defendant officers violated Standing Order 23.  The evidence cited is deposition excerpts from Herring, Burger (Plaintiff did not provide page 119 of Burger's deposition to the Court), and Figueroa.  However, none of those excerpts state that Standing Order 23 was violated or even what Standing Order 23 is.  Plaintiff has not produced Standing Order 23, and the Court does not know what it is.  Standing Order 23 will not be considered in this motion.

[15]Tasers send an electric charge into a suspect.  An officer fires wires that are attached to darts at a suspect. The officer then sends "cycles" of electricity through the wires into the suspect, which then causes the body to straighten and go to the ground, i.e. immobilization/incapacitation.  See Herring Depo. at 218, 220; see also Beaver v. City of Federal Way, 507 F.Supp.2d 1137, 1142 (W.D. Wash. 2007).  When the Taser Model M26, which was the model used by Herring, see Herring Depo. at 88, emits an electric cycle, the cycle is not a continuous flow of electricity, rather it is a series of pulses are emitted.  See Beaver, 507 F.Supp.2d at 1142.

Escareno had entered the house and grabbed for Lavette; Figueroa also entered the house and took Lavette to a side room away from Michael and the other officers. See Sanders Depo. at 76; Herring Depo. at 214-215; Escareno Depo. at 173-174. Lavette never observed any officer hit, kick, punch, or get on top of Michael. DUMF No. 13. From this point, Lavette did not see the struggle between the officers and Michael, but did hear the crackling of the Tasers. See Sanders Depo. at 77.

As Michael was falling backwards, Brown rushed inside the house and "tackled" Michael.[16] See Brown Depo. at 165-167; Herring Depo. at 215. Brown struck Michael in the forearm and struggled with Michael on the floor. See Brown Depo. at 172-173. As they were struggling, they began sliding across the floor towards the kitchen.[17] See Escareno Depo. at 182, 186; Herring Depo. at 222.

Burger also entered the house and attempted to control one of Michael's arms. See Herring Depo. at 217, 221. Burger told Michael to stop fighting. See Escareno Depo. at 182. Escareno also told Michael to calm down. See Escareno Depo. at 182-183. Burger and Escareno were trying to control Michael's arms. See Herring Depo. at 221.

While Burger, Escareno, and Brown were struggling with Michael and unable to control him, Herring fired his Taser a second time, hitting Michael in the left arm.[18] See Herring Depo. at 218, 220-221. About 20 to 30 seconds elapsed between Herring firing his first and second Taser shots. See id. at 220. Herring sent two cycles through Michael during the second shot.[19]

---

[16]Brown testified that he saw Michael falling, so Brown then fell on top of Sanders. See Brown Depo. at 165-166. Since Brown's forward motion was obviously acting on Michael, the Court will use the term "tackle."

[17]Escareno and Herring testified that the kitchen was a source for weapons. See Escareno Depo. at 185; Herring Depo. at 242.

[18]Plaintiff states that Brown tackled Michael and controlled about 70% of Michael's body. See Plaintiff's Opposition at 5. The evidence cited by Plaintiff in no way supports this assertion. In fact, the deposition excerpt cited states that no control holds were used because "we did not have control of him." Brown Depo. at 172-173.

[19]Plaintiff states that Herring sent three cycles into Michael during the second shot. See Plaintiff's Opposition at 5. However, the pages of Herring's deposition that Plaintiff cites establish that Herring sent two cycles through on the second or "arm shot." At page 224, Herring agrees that, on the "forearm," he sent one cycle through and then sent a second cycle through. See Herring Depo. at 224:7-10. Herring proceeded to testify that he did not believe that he sent a third cycle through. See id. at 224:16-18. At pages 226 through 227, there is a mention of a third cycle going through. See id. at 227:3-5. However, when Herring was asked how he could tell if the second

See Herring Depo. at 224, 227. Again, the two Taser cycles had no effect on Michael, and Michael continued to struggle with the officers. See id. at 223-227.

Apparently as Herring sent cycles into Michael during the second Taser shot, Escareno drew his Taser and fired into Michael's stomach. See Escareno Depo. at 177-178; Plaintiff's Opposition at 5. Escareno sent one 5 second cycle into Michael. See id. at 178. However, Michael continued to struggle and slide on the floor. See id.

As Michael continued to struggle, he was beginning to sit up and Herring fired his third Taser shot into Michael's back. See Herring Depo. at 222. Herring sent one cycle through on the third shot. See id. at 229. Michael "went down," but the darts came out. See id. Michael then continued to struggle, rising up and down. See id. Herring then holstered his Taser and went to try and control Michael's feet. See id. Between Herring's first shot and cycle and his third shot and last cycle, Herring estimated that approximately one minute elapsed. See id. at 229-230. During this time, Brown was yelling Michael's name and telling him to stop and put his hands behind his back. See id. at 230.

At some point, Escareno reloaded his Taser and sent his second shot into Michael, hitting him in the back. See Escareno Depo. at 183-184. Escareno held the trigger down between 10 and 20 seconds, or a maximum of four 5-second cycles. See id. at 184. Escareno's Taser did not appear to affect Michael, and he kept struggling with the officers. See id. at 185. Escareno testified that Michael was still sliding on the ground towards the kitchen and Michael's knees were starting to come up past Brown's shoulders. See id. Escareno eventually let go of his Taser and tried to control Michael, but Michael was lifting Escareno up with his arm. See id. at 186.

At this point, Burger and Escareno were at Michael's arms, Herring had a hold of Michael's ankles, and Brown had managed to straddle Michael's body.[20] See Herring Depo. at 233. During this time, Michael was continuing to yell, scream, kick, and trying to get up. See id.

---

cycle worked and if he was sending a third cycle through, Herring himself asked, "Are you talking about the second cycle meaning the first in the arm?" Id. at 226:10-14. The questioner responded, "Right." Id. at 226:15. Thus, the evidence cited by Plaintiff shows that two cycles, not three, were sent into Michael during Herring's second shot.

[20]Escareno indicated that it was difficult to get control of Michael in part because Michael was slippery from either water or sweat or both. See Escareno Depo. at 182.

In other words, despite several applications of the Taser, Michael continued to physically resist officers' verbal orders and attempts to subdue him.  See DUMF No. 12.  Michael was yelling incoherently and at points in the struggle (towards the end) yelled, "I'm dead, I'm dead," over and over again.  See Herring Depo. at 257-258.

Brown then took Escareno's Taser from him.  See Brown Depo. at 182.  Brown removed the dart pack from the Taser.[21]  See id. at 183.  Brown then performed several drive-stuns to Michael's groin area.[22]  See id. at 184-185.  Brown continued to drive stun until Michael stopped moving and the officers were able to handcuff Michael.  See id. at 185; Garcia Report at 14.  In other words, Michael did not stop physically resisting officers until the Taser was finally deployed in the "drive stun" mode.[23]  DUMF No. 14.  Brown guessed that he did five drive stun applications to Michael.  See Garcia Depo. at 146.  Each application appears to have been for 5-second cycles.  See Garcia Depo. at 76.  Drive stun mode is considered a last resort and should rarely be used.  See id. at 65.  Prior to this incident, Brown had never performed a drive stun application on a suspect.  See Brown Depo. at 189.  During the struggle, Michael had been shot five times (three by Herring and two by Escareno) with Taser darts, drive stunned 5 times by Brown, and had a maximum of fourteen 5-second cycles applied to him (5 by Brown, 5 by Escareno, and 4 by Herring).

When Michael stopped moving and screaming, he said that he gave up.  See Herring Depo. at 258.  Burger handcuffed Michael; Michael was on his back and his hands were over his head.  See Burger Depo. at 177; see also Herring Depo. at 261.  Michael behaved in a calmer

---

[21]Brown said that he was in contact with Michael and had time to remove the dart pack, but that what he had was "all but of a second."  Brown Depo. at 183.

[22]A drive stun or contact stun is when the darts from a Taser are removed and the Taser is placed in direct contact with the subject and then electricity is cycled through.  In other words, the electricity goes directly from the Taser to the subject without the conduit of wires.  See Brown Depo. at 184-185; see also Goebel v. Taser Int'l, Inc., 2007 U.S. Dist. LEXIS 68560, *6 n.3 (N.D. Ohio 2007).

[23]Plaintiff disputes this DUMF by stating, without citation, that there is no reliable evidence that Michael's movements were anything more than electroshock convulsions.  There is no evidence from Plaintiff that Michael's physical behavior was consistent with or was even possible from the application of a Taser.  Plaintiff's unsupported statement creates no factual dispute.  See Galen v. County of Los Angeles, 477 F.3d 652, 658 (9th Cir. 2007); Del Carmen Guadalupe v. Agosto, 299 F.3d 15, 23 (1st Cir. 2002).  DUMF No. 14 is established.

fashion, and apparently was in a sitting position.  See Herring Depo. at 261; see also Burger

Depo. at 177; Escareno Depo. at 213.  The officers then unlocked one cuff, put Michael's hands

behind his back, and then connected a second set of handcuffs (due to Michael's size) to the set

already on Michael.[24]  See Herring Depo. at 261; Escareno Depo. at 213-214.  Michael then sat

with his hands cuffed behind his back.  See Herring Depo. at 261.  Escareno testified that

Michael was first breathing hard, but later was able to talk normally after sitting up against a

cabinet.  See Escareno Depo. at 219-220.  Apparently prior to cuffing, the officers called for

paramedics, not because Michael exhibited signs of distress, but as part of their routine since a

Taser had been applied/utilized.  See DUMF No. 15; Escareno Depo. at 233.  Before the

paramedics arrived, Michael rolled over onto his stomach/the side of his stomach several times.

See Herring Depo. at 280-282.  When Michael rolled over, he would say that he could not

breathe, so the officers would place him back in a sitting position.[25]  See Herring Depo. at 281-

282; Garcia Report at 14.  When paramedics arrived, Michael was prone on his stomach and no

one told the paramedics that Michael had been sitting up, but the paramedics were told that this

had been a 5150 call, there had been a struggle, and Michael had been tazed numerous times.

See Henrickson Interview at 1-3.[26]  Paramedic Henrickson took Michael's pulse, observed that

Michael was breathing well on the ground, and communicated with Michael, although Michael

---

[24]Plaintiff cites Herring's deposition at 267:21 to 268:17 for the proposition that Michael was placed on his stomach while the second set of handcuffs were placed.  See Plaintiff's Opposition at 7.  However, this portion of Herring's deposition states that Michael's hands were cuffed behind his back and that one unknown officer stayed with Michael while the others talked with Lavette or did a protective sweep of the house.  It does not state that Michael was placed on his back.

[25]Citing Garcia's report at page 14, Plaintiff states, "Michael [] complained repeatedly that he could not breathe, but the officers did nothing."  Plaintiff's Opposition at 7.  The relevant portion of page 14 of Garcia's report reads, "The male [Michael] kept falling over onto his side and each time he was placed back up into the sitting position.  When he would fall over to his side, he would say he couldn't breathe, but it didn't appear he was having any problems breathing."  Plaintiff's Exhibit I at 14.  Plaintiff's opposition gives the distinct impression that Michael was randomly complaining about being unable to breathe and that the officers ignored him.  From Garcia's report (the evidence cited by Plaintiff), that is clearly not what happened.  Based on Garcia's report, it was only when Michael fell over that he complained that he could not breathe.  The officers did not "do nothing," instead they propped him back up and the report does not indicate that Michael continued to complain that he could not breathe while he was propped up.  See id.

[26]The paramedics' depositions apparently have not been taken, and no party objects to Henrickson's interview, which is Plaintiff's Exhibit L.

was not making much sense.  See id. at 3-5.  Michael was then placed face down on a gurney,[27]

see Brown Depo. at 213; Figueroa Depo. at 94; Henrickson Interview at 4, his handcuffs were

removed, soft restraints from the gurney were fastened on him, and he was then placed on his

back on the gurney.  See Escareno Depo. at 244; Henrickson Interview at 4.  No one said that

Michael should not be placed face down on the gurney.  See Burger Depo. at 201.  A couple of

minutes after the soft restraints  were attached, Escareno noticed Michael's eyes rolling back and

informed the paramedics.  See Escareno Depo. at 247.  One paramedic responded that Michael

was fine.  See id. at 248.  Michael was rolled out of the house, but shortly thereafter, as Escareno

was leaving, the ambulance door opened and the paramedics said that Michael had "coded," i.e.

gone into respiratory distress.  See id. at 249. Michael had been on his stomach only very briefly

and had continued to provide verbal responses to paramedics and officers.  See DUMF No. 16.

Once paramedics announced that Michael had "coded," Burger assisted with CPR and Escareno

drove the ambulance.  See DUMF No. 17; Herring Depo. at 301.  However, their efforts were not

enough and Michael died.  The coroner's report indicates that Michael died due to

"complications of cocaine intoxication."  DUMF No. 1.


---

## LEGAL STANDARDS

Summary judgment is appropriate when it is demonstrated that there exists no genuine

issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Fortyune v.

American Multi-Cinema, Inc., 364 F.3d 1075, 1080 (9th Cir. 2004); Jung v. FMC Corp., 755

F.2d 708, 710 (9th Cir. 1985).  Where summary judgment requires the court to apply law to

undisputed facts, it is a mixed question of law and fact.  See Sousa v.Unilab Corp. Class II (Non-

Exempt) Members Group Benefit Plan, 252 F. Supp.2d 1046, 1049 (E.D. Cal. 2002).  Where the

case turns on a mixed question of law and fact and the only dispute relates to the legal

significance of the undisputed facts, the controversy for trial collapses into a question of law that

---

[27]Figueroa testified that the officers assisted the paramedics in placing Michael on the gurney.
See Figueroa Depo. at 94.

1   is appropriate for disposition on summary judgment.  See Union Sch. Dist. v. Smith, 15 F.3d

2   1519, 1523 (9th Cir. 1994); Sousa, 252 F.Supp.2d at 1049.

> Under summary judgment practice, the moving party always bears the initial
> responsibility of informing the district court of the basis for its motion, and
> identifying those portions of "the pleadings, depositions, answers to
> interrogatories, and admissions on file, together with the affidavits, if any," which
> it believes demonstrate the absence of a genuine issue of material fact.

6   Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the

7   burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made

8   in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on

9   file.'"  Id.  Indeed, summary judgment should be entered, after adequate time for discovery and

10  upon motion, against a party who fails to make a showing sufficient to establish the existence of

11  an element essential to that party's case, and on which that party will bear the burden of proof at

12  trial.  Id. at 322.  "[A] complete failure of proof concerning an essential element of the

13  nonmoving party's case necessarily renders all other facts immaterial."  Id.

14      If a moving party fails to carry its burden of production, then "the non-moving party has

15  no obligation to produce anything, even if the non-moving party would have the ultimate burden

16  of persuasion."  Nissan Fire & Marine Ins. Co. v. Fritz Companies, 210 F.3d 1099, 1102-03 (9th

17  Cir. 2000).  If the moving party meets its initial burden, the burden then shifts to the opposing

18  party to establish that a genuine issue as to any material fact actually exists.  See Matsushita Elec.

19  Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Nissan Fire & Marine, 210 F.3d at

20  1103; Nolan v. Cleland, 686 F.2d 806, 812 (9th Cir. 1982); Ruffin v. County of Los Angeles, 607

21  F.2d 1276, 1280 (9th Cir. 1979).  A fact is "material" if it might affect the outcome of the suit

22  under the governing law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986);

23  Thrifty Oil Co. v. Bank of America Nat'l Trust & Savings Assn, 322 F.3d 1039, 1046 (9th Cir.

24  2002).  A "genuine issue of material fact" arises when the evidence is such that a reasonable jury

25  could return a verdict for the nonmoving party.  See Anderson, 477 U.S. at 248-49; Thrifty Oil,

26  322 F.3d at 1046.  The opposing party "must do more than simply show that there is some

27  metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could not lead

28  a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"

Matsushita, 475 U.S. at 587 (citation omitted).  "A motion for summary judgment may not be defeated, however, by evidence that is 'merely colorable' or 'is not significantly probative.'" Anderson, 477 U.S. at 249-50; Hardage v. CBS Broad. Inc., 427 F.3d 1177, 1183 (9th Cir. 2006). If the nonmoving party fails to produce evidence sufficient to create a genuine issue of material fact, the moving party is entitled to summary judgment. See Nissan Fire & Marine, 210 F.3d at 1103.

In attempting to establish the existence of a factual dispute, the opposing party may not rely upon the mere allegations or denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Rule 56(e); Matsushita, 475 U.S. at 586 n.11; First Nat'l Bank, 391 U.S. at 289; Willis v. Pacific Maritime Ass'n, 244 F.3d 675, 682 (9th Cir. 2001).  However, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  First Nat'l Bank, 391 U.S. at 290; Hopper v. City of Pasco, 248 F.3d 1067, 1087 (9th Cir. 2001).  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  Matsushita, 475 U.S. at 587; Mende v. Dun & Bradstreet, Inc., 670 F.2d 129, 132 (9th Cir. 1982).

The court has the discretion in appropriate circumstances to consider materials that are not properly brought to its attention, but the court is not required to examine the entire file for evidence establishing a genuine issue of material fact where the evidence is not set forth in the opposing papers with adequate references.  See Southern Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885, 889 (9th Cir. 2003); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001).  The evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party.  See Anderson, 477 U.S. at 255; Matsushita, 475 U.S. at 587; Stegall v. Citadel Broad, Inc., 350 F.3d 1061, 1065 (9th Cir. 2003).  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the

inference may be drawn.  See Mayweathers v. Terhune, 328 F.Supp.2d 1086, 1092-93 (E.D. Cal. 2004); UMG Recordings, Inc. v. Sinnott, 300 F.Supp.2d 993, 997 (E.D. Cal. 2004).  "A genuine issue of material fact does not spring into being simply because a litigant claims that one exist or promises to produce admissible evidence at trial."  Del Carmen Guadalupe v. Agosto, 299 F.3d 15, 23 (1st Cir. 2002); see Galen v. County of Los Angeles, 477 F.3d 652, 658 (9th Cir. 2007); Bryant v. Adventist Health System/West, 289 F.3d 1162, 1167 (9th Cir. 2002).

## I.      PLAINTIFF'S 42 U.S.C. § 1983 CLAIMS

### A.      Excessive Force

#### Defendants's Argument

Defendants argue that they are entitled to qualified immunity because their use of force was reasonable under the circumstances.  The officers responded to a 5150 call of a male who was tearing up the house.  They found Michael holding Lavette, Lavette was crying and said nothing to the officers, Michael was naked, had a crazed look about him, and was behaving irrationally.  The officers believed that they may be dealing with a domestic violence situation and that Michael may have been on drugs.  The officers also were concerned over a hostage situation, and when the Sanderses fell, the officers took reasonable steps to keep Michael separated from Lavette.  Once Lavette was separated, the officers continued to take reasonable actions to control Michael.  Numerous Taser applications occurred because each prior Taser application was ineffective and four officers were unable to physically control Michael.

Alternatively, even if unreasonable, the law was not so clearly established under the circumstances that the officers confronted.  Of the few cases involving multiple Taser applications, each case found no constitutional violation.  Given the significant struggle that was occurring, the other Taser cases did not put the officers on sufficient notice.  Alternatively, given the paucity of Taser cases and Michael's superhuman struggle, a reasonable officer in the defendant's position could reasonably believe that the defendants' conduct was legal.

#### Plaintiff's Opposition

Lavette argues that the officers behaved unreasonably in light of the Graham factors.

1    Lavette argues that the use of the Taser constituted the use of "deadly force."  Further, this was

2    not a rushed, rapidly developing situation, rather, the officers conversed with Michael between 2

3    and 5 minutes from the time he opened the door.[28]

4           The number and timing of Taser applications was excessive.  Herring never brandished

5    the Taser to allow Michael to hear the crackling before firing and did not give warnings or

6    compliance demands until after the Taser was used.  Brown gave the order to continue to taze

7    Michael, but did not realize that he had told more than one officer to taze.  After Brown had

8    control of most of Michael's body and Burger and Escareno had control of Michael's arms,

9    Herring shot two more Taser darts into Michael and sent more electrical cycles through him.

10   While Herring's second Taser shot wires were still in Michael, Escareno fired into Michael's

11   stomach and cycled the Taser, possibly simultaneously with Herring.  Herring then reloaded and

12   fired his third set of darts into Michael and cycled through.  Escareno reloaded his Taser and sent

13   his second set of darts into Michael.  The shot might have been simultaneous with Herring's third

14   shot.  Escareno held the trigger down for approximately 20 seconds, or 4 cycles.  Brown then

15   took Escareno's Taser, while still on Michael, and began drive stun applications to Michael's

16   groin area for approximately 5 cycles (or 25 seconds).  Brown did this while Herring held down

17   Michael's knees, and Escareno and Burger held Michael's arms.  It is likely that Herring and

18   Escareno sent electric cycles through Michael simultaneously, thereby doubling the voltage used.

19   Each electric cycle from the Taser lasted 5 seconds.  There were bruises around the Taser wounds

20   and carbonization around one of the wounds near the groin area.  See Plaintiff's Exhibit J;

21   Coroner's Report at 8.

22          Michael was always unarmed.  Because he was unarmed, this was a case of gratuitous

23   tazing.  The officers did not feel that deadly force was necessary.[29]  See Burger Depo. at 57.

24

25          ────────────

26   [28]Plaintiff cites Herring's deposition at 177:2-6 for this assertion.  That section of deposition testimony consist of a question about Burger's location and that the Sanderses answered the door after the third knock.  See Herring Depo. at 177:2-6.  The section says nothing about how long the officers conversed with Michael.

27

28   [29]Plaintiff asserts that Brown never felt threatened by Michael and cites page 220 of Brown's deposition. Plaintiff, however, has not provided page 220 of Brown's deposition.  The Court will not credit the accuracy of the representation and will disregard any references to page 220 of Brown's deposition.

Prior to Herring firing his Taser, Michael did not make any threatening gestures.  Further, the officers had less-lethal alternatives available, such as batons and pepper spray, but chose not to use them.[30]

Finally, the governmental interests at stake in this case were minimal.  Lavette was not in danger.  She never said that she felt threatened, there were no weapons around, she did not call 911, and she has never indicated that Michael had threatened to harm her.  Escareno holstered his weapon when he saw that Michael was unarmed.  Although Michael had his arm around Lavette, he was not choking her.  Lavette had no bruises, cuts or visible bleeding, and was not treated for injuries that night.  Although Herring testified that Michael was dragging Lavette back into the house, Herring indicated that the Sanders only backed 1 to 2 feet into the house.  Further, the decision to fire the first Taser shot was made after Michael and Lavette had separated.  Further, the officers had Michael and Lavette effectively surrounded.[31]   After Figueroa took Lavette to the next room, the officers knew that she was in no danger and yet multiple tazings occurred.  Therefore, on balance, the use of force was clearly excessive.

*Legal Standards*

*Excessive Force*

All claims that law enforcement officers used excessive force, either deadly or non-deadly, in the course of an arrest, investigatory stop, or other seizure of a citizen are to be analyzed under the Fourth Amendment and its standard of objective reasonableness.  See Graham

---

[30]Plaintiff also states that the officers' conduct was contrary to training, in that they tazed a wet individual, and that the conduct violated Standing Order 23 because no warnings were given.  With respect to Standing Order 23, as explained *supra*, the Court will not consider this.  As for a violation of training by tazing a wet individual, Plaintiff cites to Herring's and Escareno's depositions.  Herring's deposition actually says that his training did not tell him to not taze a wet individual.  See Herring Depo. at 232.  Plaintiff has not provided the Court with pages 92 and 93 of Escareno's deposition.  The Court will not credit the accuracy of Plaintiff's characterization and will disregard any references to pages 92-93 of Escareno's deposition.

[31]Plaintiff states that the Sanderses were effectively surrounded and that Escareno testified that Burger and Figueroa were behind Michael and Lavette prior to the first shot.  See Plaintiff's Opposition at 18.  Plaintiff cites Escareno's deposition at 159:12-16 in support of this assertion.  That section of the deposition reads, "I believe they were behind me in the yard, but again my focus and concentration was on Michael and Lavette."  See Escareno Depo. at 159:12-16.  The passage does not deal with Tasers, the "they" of the deposition is not even identified, but assuming that "they" is Burger and Figueroa, Escareno places them, not inside the house behind Michael and Lavette, but behind Escareno in the yard.  The deposition passage clearly does not support Plaintiff's assertion.

v. Connor, 490 U.S. 386, 395 (1989); Drummund v. City of Anaheim, 343 F.3d 1052, 1056 (9th Cir. 2003).  The pertinent question in an excessive force case is whether the use of force was "objectively reasonable in light of the facts and circumstances confronting [the officers], without regard to their underlying intent or motivation."  Graham, 490 U.S. at 397; Blankenhorn v. City of Orange, 485 F.3d 463, 477 (9th Cir. 2007).  The analysis of whether a specific use of force was reasonable "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing government interests at stake."  Graham, 490 U.S. at 396; Blankenhorn, 485 F.3d at 477; Davis v. City of Las Vegas, 478 F.3d 1048, 1054 (9th Cir. 2007).  "We first assess the quantum of force used to arrest [the plaintiff]" and then "measure the governmental interests at stake by evaluating a range of factors."  Davis, 478 F.3d at 1054.  Factors that are considered in assessing the government interests at stake include, but are not limited to, "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  Graham, 490 U.S. at 396; Blankenhorn, 485 F.3d at 477; Davis, 478 F.3d at 1054.  Further, where it is or should be apparent that an individual is emotionally or mentally unstable, that is a factor that must be considered in determining the reasonableness of the force employed.  See Drummond, 343 F.3d at 1058.  "In some cases . . ., the availability of alternative methods of capturing or subduing a suspect may be a factor to consider."  Smith v. City of Hemet, 394 F.3d 689, 701 (9th Cir. 2005). Reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  Graham, 490 U.S. at 396; Drummond, 343 F.3d at 1058.  "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation."  Graham, 490 U.S. at 396-97; Drummond, 343 F.3d at 1058.  Since "[n]ot every push or shove, even if it may seem unnecessary in the peace of the judge's chambers, . . . violates the Fourth Amendment," Graham, 490 U.S. at 396, "[n]either tackling nor punching a suspect to make an arrest necessarily constitutes excessive force."  Blankenhorn, 485 F.3d at 477.  "Force is

16

excessive when it is greater than is reasonable under the circumstances." Santos v. Gates, 287

F.3d 846, 854 (9th Cir. 2002).  When the circumstances show that there is no need for force, any

force used is constitutionally unreasonable.  See Fontana v. Haskin, 262 F.3d 871, 880 (9th Cir.

2001); see also Motley v. Parks, 432 F.3d 1072, 1089 (9th Cir. 2005).

*Qualified Immunity*

Qualified immunity protects "government officials . . . from liability for civil damages

insofar as their conduct does not violate clearly established statutory or constitutional rights of

which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982);

Phillips v. Hust, 477 F.3d 1070, 1079 (9th Cir. 2007); Brittain v. Hansen, 451 F.3d 982, 987 (9th

Cir. 2006).  The "concern of the immunity inquiry is to acknowledge that reasonable mistakes

can be made," and that it is "often difficult for an officer to determine how the relevant legal

doctrine will apply to the factual situation that he faces." Estate of Ford v. Ramirez-Palmer, 301

F.3d 1043, 1049 (9th Cir. 2002).

A court employs a tiered analysis for determining qualified immunity.  See Saucier v.

Katz, 533 U.S. 194, 200-02 (2001); Skoog v. County of Clackamas, 469 F.3d 1221, 1229 (9th

Cir. 2006); Brittain, 451 F.3d at 987.   Under the first step, the court determines whether, "taken

in the light most favorable to the party asserting the injury, do the facts show the officer's

conduct violated a constitutional right?" Saucier, 533 U.S. at 201; Phillips, 477 F.3d at 1079;

Skoog, 469 F.3d at 1229.  If the answer is "no," then the inquiry ends and the plaintiff cannot

prevail; if the answer is "yes," the court continues the analysis.  See Saucier, 533 U.S. at 201;

Blankenhorn v. City of Orange, 485 F.3d 463, 471 (9th Cir. 2007); Johnson v. County of Los

Angeles, 340 F.3d 787, 793-94 (9th Cir. 2003).

Under the second step, the court determines "whether the right was clearly established,"

and applies an "objective but fact-specific inquiry." Inouye v. Kemna, 504 F.3d 705, 712 (9th

Cir. 2007); see Saucier, 533 U.S. at 202; Brittain, 451 F.3d at 988.  The critical question is

whether "the contours of the right were sufficiently clear that a reasonable official would

understand that what he is doing violates the right." Saucier, 533 U.S. at 202; Phillips, 477 F.3d

at 1079.  Whether a right is clearly established must be "undertaken in light of the specific

context of the case, not as a broad general proposition." Saucier, 533 U.S. at 201; Skoog, 469

F.3d at 1229-30.  In making this determination, the court considers the state of the law at the time

of the alleged violation, but it is unnecessary for the precise conduct in question to have been

previously held unlawful.  See Inouye, 504 F.3d at 712; Devereaux v. Perez, 218 F.3d 1045,

1052 (9th Cir. 2000).  Further, the court considers the "information possessed" by the officer at

the time of his conduct.  See Hunter v. Bryant, 502 U.S. 224, 227 (1991); Anderson v. Creighton,

483 U.S. 635, 641 (1987); Edgerly v. City & County of San Francisco, 495 F.3d 645, 654 (9th

Cir. 2007).  If the officer could have reasonably, but mistakenly, believed that his conduct did not

violate a clearly established constitutional right, then the officer will receive qualified immunity.

See Saucier, 533 U.S. at 205-06; Skoog, 469 F.3d at 1229; Johnson, 340 F.3d at 794; Jackson v.

City of Bremerton, 268 F.3d 646, 651 (9th Cir. 2001).  As a wholly objective inquiry, see

Brittain, 451 F.3d at 988, the "'subjective beliefs' of the actual officer are . . . irrelevant."

Inouye, 504 F.3d at 712; see Anderson, 483 U.S. at 641.  Thus, qualified immunity applies "if 'a

reasonable officer could have believed [the action] to be lawful, in light of clearly established law

and the information the . . . officer[] possessed.'"  Lawrence v. United States, 340 F.3d 952, 956-

957 (9th Cir. 2003); see also Hunter, 502 U.S. at 227.  Whether the law was "clearly established"

and whether an officer could have a reasonable, albeit mistaken, belief that the conduct was

lawful are questions of law for the court to decide when the pertinent material facts are

undisputed.  See Franklin v. Fox, 312 F.3d 423, 437 (9th Cir. 2002); LaLonde v. County of

Riverside, 204 F.3d 947, 953-954 (9th Cir. 2000); Neely v. Feinstein, 50 F.3d 1502, 1509 (9th

Cir. 1995); Act Up!/Portland v. Bagley, 988 F.2d 868, 873 (9th Cir. 1993).

### *Discussion*

In this case, there are multiple uses of force by multiple officers.  Since Lavette's

complaint alleges improper use of a Taser by four specific officers, the Court will analyze the

conduct of each officer's use of force separately.

1.    Jesse Herring

The force utilized by Herring was three Taser shots consisting of 4 electric cycles and

attempting to physically control Michael's legs.  With respect to the Taser shots and cycles, no

evidence has been presented regarding the "nature" of a Taser application.  Plaintiff implies without citation that the use of a Taser represents the use of "deadly force."  The Ninth Circuit defines deadly force as force that creates a substantial risk of causing death or serious bodily injury.[32]  Blanford v. Sacramento County, 406 F.3d 1110, 1115 n.2 (9th Cir. 2005).  However, case law indicates that Tasers are generally considered non-lethal or less lethal force.  See Ewolski v. City of Brunswick, 287 F.3d 492, 508 (6th Cir. 2002); Matta-Ballesteros v. Henman, 896 F.2d 255, 256 n.2 (7th Cir. 1990); Montgomery v. Morgan County, 2008 U.S. Dist. LEXIS 15846, *32 (S.D. Ind. 2008); Fuller v. Cuyahoga Metro. Hous. Auth., 2008 U.S. Dist. LEXIS 8730, *57 n.25 (N.D. Ohio 2008); McDonald v. Pon, 2007 U.S. Dist. LEXIS 92356, *6-*7 (W.D. Wash. 2007); see also San Jose Charter of the Hells Angels Motorcycle Club v. City of San Jose, 402 F.3d 962, 969 n.8 (9th Cir. 2005); cf. Draper v. Reynolds, 369 F.3d 1270, 1278 (11th Cir. 2004).  Tasers have been described as "a non-lethal device commonly used to subdue individuals resisting arrest.  It sends an electric pulse through the body of the victim causing immobilization, disorientation, loss of balance, and weakness.  It leaves few, if any, marks on the body of the victim."  Matta-Ballesteros, 896 F.2d at 256 n.2.  Similarly, another court has explained that a Taser "works by causing involuntary muscle contractions, similar to muscle cramps, that preclude the suspect from engaging in the type of coordinated motion necessary to fight or flee."  McDonald, 2007 U.S. Dist. LEXIS 92356 at *7.  Further, one court has noted that pain is a necessary byproduct of the Taser, pain is not the primary motivator, the Taser is considered to inflict considerably less pain than other forms of force, and the effects of the Taser are generally temporary.  See Beaver v. City of Federal Way, 507 F.Supp.2d 1137, 1142-43 (W.D. Wash. 2007).  No evidence has been presented that Tasers constitute force that creates a substantial risk of death.  It is true that Michael died following a struggle in which multiple Taser applications were used, but Michael clearly did not die immediately, he was able to breathe and

---

[32]However, the Supreme Court has recently explained that deadly force cases are viewed through the Fourth Amendment's reasonableness test and not through a special set of "rigid preconditions."  Scott v. Harris, 127 S.Ct. 1769, 1777 (2007); see also Acosta v. Hill, 504 F.3d 1323, 1324 (9th Cir. 2007).  In light of Scott, the Ninth Circuit has overruled its prior holdings that an excessive force instruction based on the Fourth Amendment's reasonableness standard is not a substitute for a deadly force instruction.  Acosta, 504 F.3d at 1324.

converse with the officers and Henrickson, and the coroner's report indicates that he died due to complications associated with cocaine ingestion.  The Court will view the use of a Taser as an intermediate or medium, though not insignificant, quantum of force that causes temporary pain and immobilization.  See Matta-Ballesteros, 896 F.2d at 256 n.2; Beaver, 507 F.Supp.2d at 1142-43; McDonald, 2007 U.S. Dist. LEXIS 92356 at *6-*7; see also Draper, 369 F.3d at 1278.

>        a.        First Taser Application

At the time of the first Taser application, the officers were in the process of investigating a 5150 call in which it was reported that a female was heard crying and a man was "tearing up" the home.  When the officers arrived, Lavette was upset, crying, and said nothing to the officers and was being held from behind by Michael.  The officers reasonably believed that they were dealing with a domestic violence situation, which entails forms of assault and battery.[33]  See Cal. Pen. Code §§ 241, 243, 245.  Further, Michael was wet, naked, irrational, had a crazed or wide eyed look, said the police were there to kill him, and said that they were not going to take Lavette away from him.[34]  The officers reasonably believed that a hostage situation could develop or was developing, which could entail false imprisonment or false imprisonment for use as a shield.  See Cal. Pen. Code §§ 210.5, 236.[35]  Although the initial 5150 call is not a crime, after Michael and Lavette answered the door, the officers were dealing with possible misdemeanor offenses of assault, battery, and false imprisonment, and there was the potential for false imprisonment for use as shield.  Assault, battery, and false imprisonment all affect the physical well being of a third party, Lavette.  Because of the potential danger to Lavette, the Court believes that the officers were dealing with at least medium level crimes despite their classification as misdemeanors.

Michael was on his back and a 2 foot separation between himself and Lavette was created

---

[33]Assault can be either a misdemeanor or felony.  See Cal. Pen. Code §§ 241, 245.  Batteries against a spouse are misdemeanors that carry a maximum $2,000 fine.  See Cal. Pen. Code § 243(e)(1).

[34]The officers correctly surmised that Michael was under the influence of a drug (cocaine), but the officers did not testify that they were investigating drug possession.

[35]False imprisonment is a misdemeanor, but false imprisonment for purposes of protection from arrest or use as a shield is a felony.  See Cal. Pen. Code §§ 210.5, 237.

when they fell.  At that point, there was no significant threat to the officers.  With respect to Lavette, Michael initially told the officers that they were not going to take Lavette from him and was standing behind Lavette with his arm around her upper torso.  Michael then began moving back into the house and taking Lavette with him.  After they fell, Michael was shouting that the officers were not going to take Lavette away from him.  The 2 foot separation lessened the threat to Lavette, but a 2 foot distance, even if one is on one's back, can be quickly bridged, especially by someone who appears to be sweaty, paranoid, and agitated.  However, Michael did not attempt to regain control of or grab for Lavette between the time they fell and the time Herring fired the Taser, and there is no time estimate provided between these two events.  The impression given is that little time elapsed.  Therefore, there was still a threat to Lavette after the fall, but the threat had diminished due to the separation.

Michael was not resisting or evading arrest prior to the first Taser application.  Herring testified that he told Michael to get down, but the evidence indicates that Michael was on his back as a result of the fall.  If Michael was already down, he could not get down further.

Michael's mental status was altered, apparently by cocaine use.  Michael was clearly not processing information correctly since he did not recognize that the officers were the police and believed that they were there to kill him.

Lavette asserts that there were alternative methods available to Herring other than the Taser, but does not discuss in any detail which methods were available, if those methods constituted less force, or how effective those methods would have been in the situation. Escareno's attempt at asking Michael to let Lavette go and his assurances that they were not there to hurt Michael failed.  Given Michael's agitated and paranoid state of mind it seems doubtful that further verbal commands would have worked.  Lavette cites Figueroa's testimony that she had taken out her pepper spray and baton.  However, Figueroa never used those items and her testimony does not elaborate on whether use of those items would be advisable.  Herring testified that there were "a lot" of problems associated with pepper spray, including having to wrestle with Michael after using the spray.  See Herring Depo. at 147-148; cf. McDonald, 2007 U.S. Dist. LEXIS 92356 at *7 n.6.  Further, it seems that a strike from a solid baton can be at least equally

forceful, if not more so, than a Taser.  See McDonald, 2007 U.S. Dist. LEXIS 92356 at *6 n. 4.

What does appear to have been available to Herring was physical force.  In other words, it

appears that Herring could have tackled or fallen on Michael like Brown did, although Michael

appears to have been quite stout.[36]

As discussed above, use of the Taser is a medium or intermediate level of force.  While

Tasers are designed to cause temporary immobilization, the Taser did not have this desired effect

on Michael.  At best, it appears that Michael felt discomfort; he certainly was not temporarily

immobilized.  In other words, there was very little if any outward effect on Michael.

Plaintiff argues that this was not a rapidly developing situation.   The Court cannot agree.

The evidence indicates that about one minute elapsed from the time the officers were talking with

Michael to the time Herring fired the Taser.  Further, the dynamic of the entire situation changed

as soon as Michael and Lavette fell:  there was no further dialogue, other officers rushed in, and

decisions had to be made very quickly so that Michael would not be an immediate threat to

Lavette.  This was a rapidly developing situation.

In *Draper v. Reynolds*, 369 F.3d 1270 (11th Cir. 2004), the Eleventh Circuit discussed the

single application of a Taser on a suspect following a traffic stop.  In finding no constitutional

violation, the Eleventh Circuit explained:

> In the circumstances of this case, Reynolds's use of the taser gun to effectuate the
> arrest of Draper was reasonably proportionate to the difficult, tense and uncertain
> situation that Reynolds faced in this traffic stop, and did not constitute excessive
> force. From the time Draper met Reynolds at the back of the truck, Draper was
> hostile, belligerent, and uncooperative. No less than five times, Reynolds asked
> Draper to retrieve documents from the truck cab, and each time Draper refused to
> comply. Rather, Draper accused Reynolds of harassing him and blinding him with
> the flashlight. Draper used profanity, moved around and paced in agitation, and
> repeatedly yelled at Reynolds. Because Draper repeatedly refused to comply with
> Reynolds's verbal commands, starting with a verbal arrest command was not
> required in these particular factual circumstances. More importantly, a verbal
> arrest command accompanied by attempted physical handcuffing, in these
> particular factual circumstances, may well have, or would likely have, escalated a
> tense and difficult situation into a serious physical struggle in which either Draper
> or Reynolds would be seriously hurt. Thus, there was a reasonable need for some
> use of force in this arrest.

[36]However, the *McDonald* court recognized that such physical force places the officer in closer proximity to a suspect.  See McDonald, 2007 U.S. Dist. LEXIS 92356 at *6 n.5.

Although being struck by a taser gun is an unpleasant experience, the amount of force Reynolds used - a single use of the taser gun causing a one-time shocking - was reasonably proportionate to the need for force and did not inflict any serious injury. Indeed, the police video shows that Draper was standing up, handcuffed, and coherent shortly after the taser gun stunned and calmed him. The single use of the taser gun may well have prevented a physical struggle and serious harm to either Draper or Reynolds. Under the "totality of the circumstances," Reynolds's use of the taser gun did not constitute excessive force, and Reynolds did not violate Draper's constitutional rights in this arrest.

Draper, 369 F.3d at 1278.

In light of *Draper* and the *Graham* considerations discussed above, Herring's initial use of the Taser was reasonable. Michael was agitated, did not obey the request to let Lavette go, believed that the officers were there to kill him and/or take Lavette away from him, appeared to be under the influence of drugs (and was), had physical control of Lavette (who was upset, verbally silent, and crying and whose behavior was consistent with one who has suffered domestic violence), and was trying to take her back into the house. It was clearly a reasonable priority to separate Michael from Lavette. When Michael and Lavette fell, an opportunity suddenly arose. A separation of 2 feet was created, but 2 feet is not a great distance. To maintain that separation, and in the midst of shouts that the officers were not going to take Lavette from him, it was reasonable for Herring to use his Taser. The Taser normally would have caused temporary immobilization without lasting effects. Keeping Michael immobilized and the separation of 2 feet maintained until other officers could pull Lavette up and away appears to have been a good fit for this situation. It is true that Herring could have fallen onto or tackled Michael. However, given Michael's agitation and paranoia and the temporary pain and immobilization that a Taser inflicts, it was not unreasonable for Herring to chose to maintain his distance from Michael through the Taser while other officers rushed into the room. Further, since the fall was unexpected and a distance of 2 feet can be easily bridged, the situation demanded that decisions be made very quickly. No constitutional violation was found in *Draper* where an agitated, disobedient, belligerent suspect was tazed, and the Eleventh Circuit recognized that the Taser had prevented the need for a physical struggle. Here, Michael was agitated, paranoid and non-cooperative, and appeared to have an upset and crying hostage. In normal circumstances, Michael should have reacted like Draper and been temporarily

23

1   immobilized – there then would have been no need for extended physical struggle or additional

2   Taser applications.  Accordingly, under the totality of the circumstances, Herring's first use of his

3   Taser was objectively reasonable and did not violate Michael's Fourth Amendment rights.

4        Alternatively, even if the facts viewed in the light most favorable to Lavette showed a

5   constitutional violation, qualified immunity would be appropriate.  At the time of this incident, it

6   is beyond dispute that the general right to be free from excessive force was clearly established.

7   Nevertheless, it is not enough to generally define the right in question, rather the contours of the

8   right must be viewed in the light of the circumstances confronting Herring.  See Saucier, 533

9   U.S. at 201; Inouye, 504 F.3d at 712; Skoog, 469 F.3d at 1229-30.  The Court is aware of three

10  circuit decisions that dealt with excessive force and Tasers that pre-date August 20, 2004.

11       In *Russo v. Cincinnati*, 953 F.2d 1036, 1044-45 (6th Cir. 1992), the Sixth Circuit

12  analyzed the initial and subsequent use of a Taser against an armed suspect.  The officers were

13  confronted with a potentially suicidal and homicidal individual who had a knife in each hand and

14  was a few feet within his apartment doorway, but did not threaten the officers and may have been

15  sitting on the backs of his heels at the time the Taser was used.[37]  See id.  The Sixth Circuit found

16  that, although there may have been questions regarding the reasonableness of the initial Taser

17  use, the law was not sufficiently established.  With respect to the subsequent use of the Taser, the

18  suspect had been shot with a firearm, was laying at the bottom of a stairwell, had a Taser dart in

19  his face, and posed no immediate threat to the officers when he was again tazed.  See id.  The

20  Sixth Circuit found that the subsequent tazing was a close call, but that since the tazing was

21  intended to avoid resort to lethal force, there was no excessive force.  See id.

22       In *Hinton v. City of Elwood*, 997 F.2d 774, 781-82 (10th Cir. 1993), the officers were

23  investigating a misdemeanor (disturbing the peace), and the suspect was not a threat to the

24  officers or to the public, was not armed, was not under the influence of drugs, was outnumbered

25  by the officers, and was in the company of five children.  However, the suspect refused to talk to

26  the police after they told him to stop, shoved one of officers after he was told to calm down, and

27

28

_____

[37]The cycles from the first Taser shot did not immobilize the suspect.  See Russo, 953 F.2d at 1040.

then began to wrestle with officers on the ground.  See id.  While wrestling on the ground, the officers used their Taser or "stun gun."  Id.  Part of the wrestling entailed the suspect biting the officers, and the stun gun was applied multiple times.  See id.  In light of the suspect's resistence, the Tenth Circuit found no excessive force.  See id.

The third case is *Draper v. Reynolds*, which is discussed above.  Again, the Eleventh Circuit found no excessive force in using a Taser on an uncooperative suspect, who was agitated, belligerent, and non-cooperative, and who had been stopped for a minor traffic infraction and never touched the officer.  See Draper, 369 F.3d at 1278.

In light of these cases, the Court does not believe that the law was clearly established as it relates to Taser use and excessive force.  *Russo* and *Draper* indicate that Taser use is a less lethal form of force and that use of the Taser may be appropriate to diffuse a situation so as to prevent the need for escalation.  Further, *Russo* and *Draper* involve situations in which Tasers were applied when there was no struggle or physical resistance occurring.  *Hinton* involved multiple Taser applications during a struggle, which was not the case during Herring's first Taser application.  One of the concerns of qualified immunity "is to acknowledge that reasonable mistakes can be made," and that it is "often difficult for an officer to determine how the relevant legal doctrine will apply to the factual situation that he faces."  Estate of Ford, 301 F.3d at 1049. Given Lavette's appearance and Michael's appearance and conduct, a reasonable officer in Herring's position could reasonably believe that Herring's conduct was consistent with *Russo* and *Draper*, and thus, the Fourth Amendment.  Herring is entitled to qualified immunity.

b.      Second Taser Application

Herring's testimony indicates that he reloaded and fired his Taser a second time approximately 20 to 30 seconds after the first Taser application.  The uncontradicted testimony also indicates that the first Taser shot had no immobilizing effect on Michael.

At the time of the second shot, Lavette had been helped off the floor by Escareno and removed from the room by Figueroa.  Thus, Lavette was no longer in any danger from Michael. However, Brown had tackled Michael, and Burger and Escareno were struggling with Michael's arms.  Despite being outnumbered and previously tazed, the uncontradicted testimony indicates

that Michael was not under control and was struggling with the three officers.  It does not appear that the officers were being injured and Michael was unarmed, but Michael was rising up and all were sliding towards the kitchen, which was a source of weapons.  Again, Michael had been acting agitated and paranoid, and the officers correctly surmised that he was under the influence of drugs.  Part of the difficulty in controlling Michael appears to have been that Michael was wet and slippery.  Michael was also not obeying commands to stop struggling.  In light of Michael's behavior, including his belief of whom the officers where and what they were going to do to him, and his active resistance, Michael posed an immediate threat to the officers.  The alternative force available to Herring was physical force.[38]  However, other officers were already unsuccessfully trying to physically control Michael, and a successful Taser application would cause temporary immobilization.  In the heat of the moment, it was not unreasonable for Herring to chose to try the Taser again instead of trying to physically control Michael.  Case law both prior to and after this incident have recognized that officers may utilize a Taser, even multiple times, when they are physically struggling or wrestling with a suspect in order to gain control of the suspect.  See Hinton, 997 F.2d at 781-82; Goebel v. Taser Int'l, Inc., 2007 U.S. Dist. LEXIS 68560, *4-*8, *17-*23 (N.D. Ohio 2007).  Since three officers were unable to control Michael and the first Taser application was wholly ineffective, the second Taser shot and the two cycles were reasonable.  Michael's rights were not violated when Herring shot Michael a second time with the Taser.

### c.    Third Taser Application

At the time of the third Taser application, little had changed, although it appears that Escareno had shot Michael with a Taser in the interim.  See Plaintiff's Opposition at pp. 5-6. Since Escareno was utilizing his Taser, Michael was struggling with Brown and Burger.  Again, the officers were unable to control Michael, and Burger's commands for Michael to stop were ineffective.  Herring's prior two Taser shots and three cycles had been ineffective.  Given this

---

[38]There is no significant discussion regarding alternative force available to Herring.  In the absence of evidence to the contrary, it seems to the Court that the use of a baton would constitute greater force than the Taser and the presence of the other officers would counsel against pepper spray.

ineffectiveness, attempting a third shot may have been inadvisable.  The alternatives appear to be use of the baton, which would have been a blunt force applied to Michael, or joining Burger and Brown in attempting to physically control Michael.  However, if the desired effect could be attained through the Taser, Michael would have been immobilized temporarily.  Given the heat of the moment and the continued, active resistence by Michael, Herring's final use of the Taser was not unreasonable.  Cf. Hinton, 997 F.2d at 781-82; Goebel, 2007 U.S. Dist. LEXIS 68560 at *4-*8, *17-*23.  Herring did not violate Michael's Fourth Amendment rights by firing his third Taser shot.

           d.      Physical Force

       The complaint and opposition focus on the use of Tasers.  To the extent that Herring's use of physical force may be an issue, Herring behaved reasonably.  Herring's Taser applications had not visibly affected Michael.  Three officers were struggling to control Michael, with Burger and Escareno at Michael's arms and Brown, for lack of a better term, at Michael's torso.  Herring attempted to control Michael's legs and was grabbing at Michael's ankles.  There is no indication that Herring's attempt to control Michael's legs/feet was in any way inappropriate.  Herring did not violate the Fourth Amendment by attempting to physically control Michael's legs/feet.

       2.      Eloy Escareno

       The force utilized by Escareno was two Taser shots consisting of 5 electric cycles and attempting to physically control Michael's arm.

           a.      First Taser Application

       At the time of Escareno's first Taser application, the situation appears to have been similar if not identical to the time when Herring fired his second shot.  Lavette was in another room, Michael was actively resisting the attempts of officers to physically control him, not obeying requests to stop, had been acting agitate and paranoid, appeared to be (and was) under the influence of a drug, but was unarmed.  The same alternatives that were available to Herring also appear to have been available to Escareno.  Again, however, there is no explanation whether pepper spray was a good option or whether the baton would constitute more force, and physical force from multiple officers was not working.  Further, Herring's first Taser shot had not visibly

1    affected Michael.  Although Michael was outnumbered, considering Michael's paranoid

2    comments about the officers, his resistance of Burger and Brown, the officers' inability to control

3    Michael, and their sliding towards the kitchen, Michael posed an immediate threat to the officers.

4    Escareno held the trigger for one cycle, but to no effect.  As with Herring, considering that Tasers

5    inflict temporary immobilization and pain, Escareno's first Taser shot was not unreasonable.

6    Escareno did not violate Michael's Fourth Amendment rights.

7        Alternatively, in light of *Russo*, *Hinton*, and *Draper*, qualified immunity is appropriate.

8    Particularly in *Hinton*, multiple stun gun applications occurred while the officers were wrestling

9    with Hinton, and the Tenth Circuit found no constitutional violation.  See <u>Hinton</u>, 997 F.2d at

10   781-82.  Although Michael was not biting the officers and Michael had not shoved or made

11   physical contact with the officers prior to the struggle, Michael was physically struggling with

12   multiple officers, appeared (and was) under the influence of drugs, believed that the officers were

13   there to kill him and take Lavette away, was not obeying orders to stop, and Lavette's appearance

14   had suggested domestic violence.  The law was not so clearly established that an officer in

15   Escareno's position would understand that Escareno's conduct clearly violated the Fourth

16   Amendment.

17           b.      Second Taser Application

18       At the time of Escareno's second Taser application, Lavette was still safe, Escareno's

19   previous Taser application had been ineffective, he knew that Herring had tazed Michael at least

20   twice,[39] Michael was not obeying demands to stop, physical force was not working, and Michael

21   was still struggling with the officers and sliding towards the kitchen.  Unlike other Taser

22   applications, Escareno held the trigger down for between 10 and 20 seconds; that is, Escareno

23   sent between two and four 5-second cycles into Michael.  At his deposition, Escareno explained

24   his actions:

25       [Michael]'s still beginning to try to escape.  He's sliding around, and at one point
         I remember I see his knees starting to come up past Sgt. Brown's shoulders.  So
26       when I see that I'm thinking this is not good, because this is – he's a stocky guy or

27

28       _____
         [39]In fact, Escareno was between Herring's Taser wires and actually felt the electrical cycles.  See Escarano
         Depo. at 187.

1    was a stocky guy.

2    Muscular, sweaty, under the influence of drugs, he keeps going toward the kitchen
     area, in my mind I'm thinking he's trying to get a weapon.  And if you look how
3    big Sgt. Brown is, if he can get away from Sgt. Brown, what do you think he's
     going to do to one of us.  I mean, in my mind I'm thinking we've got to stop this
4    guy.  That's why I kept my finger on the trigger.  I thought it was a delayed
     reaction and it was going to kick in.
5                    . . . . .

6    I heard my taser cycling, and I've seen – I had seen the taser work before I used it.
     I've seen other officers use it, and from what I understand even people on PCP
7    and coke, that even they have succumbed to the taser.  And when I saw this I
     thought there was something wrong with my taser.  I said this guy can't be
8    fighting through this.

9    Escareno Depo. at 185-186.

10           Based on Escareno's testimony, an increased quantum of force beyond the Taser may

11   have been reasonable.  Additionally, Escareno's Taser applications seemed to have no effect on

12   Michael.  Shortly after the five Taser shots and maximum of nine Taser cycles, Michael was still

13   able to lift Escareno off the ground with one arm.  See Escareno Depo. at 186.  Considering the

14   above, the Court cannot say that the second Taser shot and maximum of four cycles was

15   unreasonable.  In light of the evidence presented,[40] Escareno did not violate Michael's rights

16   during Escareno's second Taser shot.

17           Alternatively and as discussed above, in light of *Russo*, *Hinton*, and *Draper*, qualified

18   immunity is appropriate because a reasonable officer in Escareno's position could reasonably

19   believe that the application of the Taser was reasonable.

20                   c.       Physical Force

21           Again, to the extent that Escareno's use of physical force may be an issue, Escareno acted

22   reasonably.  Escareno attempted to gain control of Michael's arm.  Other officers were trying to

23   physically control different areas of Michael's body without success.  There is no indication that

24   Escareno's attempts to gain control Michael's arm was in any way inappropriate.  Escareno did

25   not violate the Fourth Amendment by attempting to physically control Michael's arm.

26

27   _____

28          [40]For example, Plaintiff has not submitted evidence that holding the trigger of the Taser is proscribed or
     strongly discouraged or carries with it the risk of substantial injury.

                                                   29

1      3.      Richard Brown

2          The force utilized by Brown was tackling/falling onto Michael, physical struggling, and

3    drive stun Taser applications.[41]

4              a.      Tackling and Physically Struggling With Michael

5          Again, to the extent that Brown's use of physical force may be at issue (as opposed to

6    Brown's use of the Taser), at the time Brown tackled Michael, the considerations and conditions

7    were identical to those faced by Herring prior to his first Taser shot as described above.

8    However, Brown did not have a Taser and it is unknown whether he had pepper spray or a baton.

9    When Michael and Lavette fell or were falling, Brown pushed his way forward and tackled

10   Michael.  Since it was reasonable for the officers to keep Michael and Lavette separated, Brown

11   did the only thing he could do to keep that separation – he tackled Michael.  The Ninth Circuit

12   has recognized that gang tackling can amount to excessive force.  See Blankenhorn, 485 F.3d at

13   478-79.  However, Brown was the only officer who tackled Michael, and Michael appears to

14   have suffered no injury from being tackled.  Given the totality of the circumstances, just as

15   Herring's initial Taser application was reasonable, so was Brown's tackling of Michael.

16         Further, after tackling Michael, Brown was physically struggling with him.  Michael was

17   not obeying commands to stop, was paranoid and agitated and believed that the officers were

18   there to harm him and take Lavette away, and was under the influence of a drug.  Michael was

19   strong, wet, and slippery, which made it difficult to get him under control.  There is no indication

20   that Brown's physical struggle with Michael was inappropriate or unreasonable.  Brown did not

21   violate Michael's Fourth Amendment rights when he tackled and struggled with Michael.

22              b.      Multiple Drive Stun Taser Applications

23         Brown appears to have executed five drive stun Taser applications against Michael in

24   quick succession.  At the time of the drive stuns, misdemeanor offenses were being investigated,

25

26         [41]A portion of the briefing in this case relates to the characterization of what Brown said, that is, did Brown
     "ask," "request," or "order" that Michael be tazed.  Irrespective of whether Brown "requested" or "ordered," Herring
27   did not hear Brown say to taze Michael.  See Herring Depo. at 251.  In other words, the first Taser shot and
     application was made independently of Brown.  Herring's subsequent Taser application occurred while the other
28   officers were struggling and as discussed above, Herring's subsequent Taser applications and Escareno's Taser
     applications were reasonable under the circumstances.  Brown's "order" or "request" was harmless.

Lavette was in a separate room, and Michael was actively resisting four police officers in a physical struggle.  Prior Taser shots had been ineffective and Michael was not obeying commands to stop struggling.[42]  Michael was wet and slippery, had been acting agitated and paranoid and believed the police were there to harm him and take Lavette away, and he was sliding towards the kitchen were he would have access to weapons.  The undisputed testimony indicates that all prior efforts to control Michael had failed.  The officers were in the middle of a struggle in which Michael was still able to lift up Escareno with only one arm, despite the multiple and repeated Taser applications.  Michael's resistance and the risk to the officers were not insignificant.  Plaintiff does not offer an alternative means of force that would have been more appropriate.  Due to Michael's continued resistance, his behavior as a whole, his refusal to submit to commands to stop, the failure of physical force, the failure of prior Taser shots, and the movement towards a source of weapons in the kitchen, it was reasonable for Brown to utilize the Taser in the drive stun mode.  Because Michael continued to resist, it was not unreasonable for Brown to drive stun Michael until Michael stopped resisting and struggling.  Brown did not violate Michael's Fourth Amendment rights by executing the five drive stuns.

Alternatively, even if the drive stuns violated Michael's Fourth Amendment rights, as discussed with respect to Escareno and Herring, qualified immunity is appropriate in light of *Russo*, *Hinton*, and *Draper*.  Again, in *Hinton*, the Tenth Circuit found no violation of the Constitution where Hinton was tazed "numerous times" while he was struggling/wrestling with the police.  See Hinton, 997 F.2d at 781-82.  Even if Michael's resistance was not as aggressive or severe as Hinton's, the difference in circumstances is not so stark that Brown should have understood that he was violating Michael's rights.  Additionally, as part of their analysis, the Tenth Circuit pointed out that the officers ceased their use of the stun gun as soon as the suspect was handcuffed and under control.  See id.  Here, no officer used a Taser after Michael stopped resisting and was handcuffed.  Since a reasonable officer in Brown's position could reasonably believe that Brown's conduct was lawful, Brown is entitled to qualified immunity.

---

[42]It does not appear that Brown knew how many times Michael had been tazed prior to the drive stuns.  See Brown Depo. at 164-165.

4.     Beau Burger

Contrary to the allegations in Plaintiff's complaint, no evidence indicates that Burger fired a Taser at Michael.  Instead, Burger physically struggled to control one of Michael's arms and then placed handcuffs on Michael.  See Burger Depo. at 177; Herring Depo. at 217, 221. As discussed above, it was reasonable for officers to believe that they were dealing with a possible domestic violence situation given Lavette's appearance, Michael's appearance and statements, and the 5150 call.  To keep Michael and Lavette separated and to control Michael, action was required.  There is no indication that Burger's attempts to gain control of Michael's arm was unreasonable.  Further, after Michael stopped resisting, placing handcuffs on Michael was reasonable to ensure for officer and paramedic safety in light of Michael's resistance. There is no indication that Burger violated Michael's Fourth Amendment Right against excessive force.


**B.     Failure To Monitor**

*Defendants' Argument*

Defendants argue that Plaintiff has developed an alternative theory for liability: that the officers failed to properly care for Michael after the arrest because they allowed him to be in a prone position.  However, while Michael was briefly on his stomach, he continued to communicate normally.  Further, the paramedics were in control of Michael's treatment once they arrived.  Finally, the officers participated in resuscitation efforts and even drove the ambulance.  Thus, there can be no liability for post-struggle conduct.

*Plaintiff's Opposition*

Lavette does not make any express arguments with respect to this claim.  In her factual recitation, however, she stated that Michael was placed on his stomach numerous times and that the officers did nothing when Michael complained that he was unable to breathe.

*Discussion*

Lavette's Fifth Cause of Action for negligence is premised in part on the officers' post-tazing care of Michael.  If Lavette is also alleging unconstitutional behavior by the officers based on their post-struggle monitoring and care of Michael, Defendants are correct that there is no

liability.  The evidence indicates that Michael was prone on his stomach on several instances, but there is no indication that Michael was left in that position for any considerable period of time. Prior to the paramedics arriving (they had been summoned before the struggle ended), Michael fell over on his side several times and then said he could not breathe.  However, each time the officers promptly returned him to a sitting position, and there is no evidence that Michael said that he could not breathe while in the sitting position.  There is also evidence that paramedic Henrickson arrived and found Michael in a prone position.  However, Henrickson also indicated that Michael was breathing, talking, and had a pulse.  Further, there is no evidence of how long Michael was in that prone position prior to Henrickson's arrival.  Additionally, while Michael was placed in a prone position on the gurney, he was only placed in that position long enough for the handcuffs to be removed and soft restraints to be applied.  Given Michael's prior conduct and irrational behavior, it was not unreasonable to use the gurney's restraints.  Moreover, as Defendants rightly point out, the paramedics were present during Michael's placement on the gurney,[43] and when the paramedics requested assistance after Michael's placement and later "coding," Burger and Escareno readily assisted.  Finally, Escareno informed the paramedics when he perceived that Michael was having problems on the gurney, and the paramedics checked on him and said he was okay.  Plaintiff has presented no evidence that the Defendants violated Michael's constitutional rights or that they acted unreasonably towards Michael post-struggle. Summary judgment is appropriate.  See Tatum v. City & County of San Francisco, 441 F.3d 1090, 1097-99 (9th Cir. 2006) (finding no Fourth Amendment violation where a suspect was placed in a prone position for well over a minute following a struggle and were the officers obtained medical aide but did not themselves participate in the medical treatment of suspect).

## C.   *Monell* Liability

*Defendants' Argument*

Defendants argue that, since their conduct did not violate the Constitution, there can be

---

[43]Figueroa testified that the officers helped the paramedics place Michael on the gurney.  See Figueroa Depo. at 94.

1   no municipal liability.  Alternatively, even if the Constitution was violated, Plaintiff cannot show

2   the existence of a policy, that such policy amounts to deliberate indifference, and that the policy

3   was a moving force in causing the constitutional violation.

4        *Plaintiff's Opposition*

5        Plaintiff does not explicitly address Defendants' argument or defend the cause of action.

6        *Discussion*

7        With respect to the post- and pre-struggle conduct of Herring, Escareno, Brown, and

8   Burger, the Court has found that no constitutional violation occurred.  Where there is no

9   underlying constitutional violation, there can be no municipal liability under 42 U.S.C. § 1983

10   for that conduct.  See Los Angeles v. Heller, 475 U.S. 796 (1986); Long v. City & County of

11   Honolulu, 511 F.3d 901, 907 (9th Cir. 2007); Jackson, 268 F.3d at 653.  Accordingly, Fresno is

12   not liable based on this conduct.

13        However, even assuming that the Defendants' Taser applications violated the Fourth

14   Amendment, Plaintiff has failed to identify any basis for municipal liability.  Liability only

15   attaches where the municipality itself causes the constitutional violation through "execution of a

16   government's policy or custom, whether made by its lawmakers or by those whose edicts or acts

17   may fairly be said to represent official policy."  Monell v. Department of Soc. Servs., 436 U.S.

18   658, 694 (1978); Ulrich v. City & County of San Francisco, 308 F.3d 968, 984 (9th Cir. 2002).

19   A policy or custom under *Monell* may be shown through:  (1) a longstanding practice or custom

20   which constitutes the "standard operating procedure" of the local government entity; (2) the

21   decision of a decision-making official who was, as a matter of state law, a final policymaking

22   authority whose edicts or acts may fairly be said to represent official policy in the area of

23   decision; or (3) when an official with final policymaking authority either delegated that authority

24   to, or ratified the decision of, a subordinate.  Menotti v. City of Seattle, 409 F.3d 1113, 1147 (9th

25   Cir. 2005); Ulrich, 308 F.3d at 984-85. While inadequate training may amount to a policy for

26   *Monell* liability, "adequately trained officers occasionally make mistakes; the fact that they do

27   says little about the training program or the legal basis for holding the [municipality] liable."

28   City of Canton v. Harris, 489 U.S. 378, 391 (1989).  Here, Plaintiff has provided no evidence of

34

any policies, has not shown that Fresno's training was inadequate, and has not shown any

culpable conduct by final policy makers.  All the evidence shows is a single incident by non-

policymaking police officers, which is insufficient to show a policy or custom.  See Webb v.

Sloan, 330 F.3d 1158, 1164 (9th Cir. 2003); Merritt v. County of Los Angeles, 875 F.2d 765 770

(9th Cir. 1989).  Plaintiff has not met her burden.  Summary judgment in favor of Fresno on the

*Monell* claim is appropriate.


**II.     STATE LAW CLAIMS**

  *Defendants' Arguments*

    Defendants argue that Lavette's state law claims are little more than the "mirror image"

of her federal excessive force claim.  State law claims arising out of allegations of excessive

force are analyzed under the same reasonableness standard as provided by applicable federal law.

Further, once it is determined that federal rights were not violated, the corresponding state law

claims are to be dismissed.

  *Plaintiff's Argument*

    Lavette does not respond to this argument.

  *Discussion*

    Plaintiff alleges wrongful death, battery, intentional and negligent infliction of emotional

distress, negligence, vicarious liability, and false imprisonment.

  a. Battery & Wrongful Death

    The torts of battery and wrongful death are the California law counterparts to a 42 U.S.C.

§ 1983 excessive force case.  See Munoz v. City of Union City, 120 Cal. App. 4th 1077, 1102 n.6

(2004); Susag v. City of Lake Forest, 94 Cal.App.4th 1401, 1412–13 (2002); Edson v. City of

Anaheim, 63 Cal.App.4th 1269, 1274 (1998).  Because the Court has found no violation of

Michael's constitutional rights, summary judgment in favor of Defendants on Lavette's state

counterpart causes of action for wrongful death and battery is appropriate.  See Arpin v. Sant

Clara Valley Transp. Agency, 261 F.3d 912, 922 (9th Cir. 2002); Saman v. Robbins, 173 F.3d

1150, 1156 n.6 (9th Cir. 1999); Susag, 94 Cal.App.4th at 1413.

1          b.       Intentional and Negligent Infliction of Emotional Distress

2          The elements of intentional infliction of emotional distress are: (1) extreme and

3   outrageous conduct by the defendants with the intention of causing, or reckless disregard of the

4   probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme

5   emotional distress; and (3) actual and proximate causation of the emotional distress by the

6   defendant's outrageous conduct.  Potter v. Firestone Tire & Rubber Co., 6 Cal.4th 965, 1001

7   (1999); Delfino v. Agilent Technology, Inc., 145 Cal.App.4th 790, 808 (2006).  For conduct to

8   be extreme and outrageous, it must be "so extreme as to exceed all bounds of that usually

9   tolerated in a civilized community."  Potter, 6 Cal.4th at 1001; Delfino, 145 Cal.App.4th at 809.

10  Here, the officers did not engage in extreme and outrageous behavior.  The Court has determined

11  that the officers acted reasonably in their confrontation and struggle with Michael.  Since the

12  officers' conduct was reasonable, it cannot be extreme and outrageous.  Summary judgment on

13  this claim will be granted.  Cf. Blankenship, 485 F.3d at 487 n.17 (reversing summary judgment

14  on an intentional infliction of emotional distress claim where the court was unable to determine

15  whether the officers' use of force was lawful).

16         c.       False Imprisonment

17         "False imprisonment is 'the nonconsensual, intentional confinement of a person, without

18  lawful privilege, for an appreciable length of time, however short.'"  Blankenhorn, 485 F.3d at

19  486 n.15 (quoting Molko v. Holy Spirit Assn., 46 Cal.3d 1092, 1123 (1988)); Hagberg v.

20  California Fed. Bank, 32 Cal.4th 350, 373 (2004).  Here, there is no question that Michael was

21  detained.  However, based on the 911 call, Michael's appearance and conduct, and Lavette's

22  appearance and condition, the officers had probable cause to detain Michael for at least domestic

23  battery and false imprisonment, see Cal. Pen. Code §§ 236, 243(e)(1), and were justified in

24  struggling with Michael, as discussed above.  In other words, the officers lawfully detained

25  Michael or detained him out of "lawful privilege."  Since there was no false imprisonment by the

26  officers, summary judgment is appropriate.  Cf. Blankenhorn, 485 F.3d at 486-87; cf. also Cal.

27  Gov't Code § 820.4; Cal. Pen. Code § 836.

28

36

1          d.      Negligence

2          Lavette's negligence claim has multiple parts.  First, Plaintiff alleged that the officers

3   were negligent in their post-tazing conduct towards Michael by not ensuring that he had a free

4   flow of oxygen and by allowing him to be placed face down.  Defendants' raised the issue of

5   their post-struggle conduct in the summary judgment motion and relied on a federal case, *Tatum*,

6   to argue that there could be no liability.  See Defendants' Motion at pp. 14-15.  Plaintiff never

7   expressly addressed Defendants' arguments regarding the post-struggle treatment of Michael.  As

8   discussed above, the evidence indicated that Michael was able to talk with the officers after the

9   struggle; when Michael fell over and complained that he could not breathe, the officers placed

10  him back up in a sitting position; the paramedics had been summoned prior to the end of the

11  struggle; while paramedics found Michael face down, Michael was breathing, had a pulse, and

12  was able to talk; paramedics were present while Michael was temporarily face down on the

13  gurney; and when Michael exhibited signs of serious distress, it was one of the officers who

14  noticed and notified the paramedics.  Plaintiff has not shown that the officers acted unreasonably

15  towards Michael post-struggle.  Cf. Tatum, 441 F.3d at 1097-99; cf. also City of Simi Valley v.

16  Superior Court, 111 Cal.App.4th 1077, 1084 (2003) (while discussing *res judicata* and primary

17  rights, holding that where a "federal court factually finds that the police officers' conduct was

18  objectively reasonable and grants summary judgment, [that decision] bars a state negligence

19  action premised upon violation of the same primary right."); Acuna v. Regents of University of

20  California, 56 Cal.App.4th 639, 650-51 (1997) (holding state FEHA claim barred by *res judicata*

21  where federal court had granted judgment for defendants on federal Title VII and ADEA claim).

22          Second, Plaintiff alleged that the officers were negligent in their use of the Taser against

23  Michael, including assessing any risks due to pre-existing health problems.  However, the

24  reasonableness of the Defendants' use of the Taser was by far and away the primary focal point

25  of the parties' briefing, including the reasonableness of the use of the Taser against Michael.  As

26  discussed above, Plaintiff simply alleged that the use of the Taser constituted deadly force.

27  Plaintiff did not present evidence regarding the use of Tasers against people who are suspected of

28  being on drugs or who are wet or who are naked.  Based on existing cases and the evidence

presented to it, this Court found that the use of the Taser against Michael was objectively

reasonable.  Again, Plaintiff has not shown that the use of the Taser against Michael was

unreasonable.  Cf. City of Simi Valley, 111 Cal.App.4th at 1084; Acuna, 56 Cal.App.4th at 650-

51.

Finally, Plaintiff alleges that Fresno breached a duty owed to Michael and Lavette by

failing to exercise reasonable care in the hiring, selection, and training of the officers in their

chain of command.  However, this Court previously dismissed claims for negligent hiring,

training, and selection of officers.  In the first motion to dismiss, this Court dismissed Plaintiff's

negligent hiring, selection and training claim against Fresno because she failed to identify a

specific statute that would create direct liability.  See Court's Docket Doc. No. 31 at p. 16.  In the

second motion to dismiss, the Court dismissed the same claims against Fresno because Plaintiff

stated that she was not asserting direct liability against Fresno.  See Court's Docket Doc. No. 43

at p. 8.  In the final motion to dismiss, on the basis of *Munoz v. City of Union City*, 120

Cal.App.4th 1077 (2004), the Court stated that allegations that Chief Dyer negligently hired,

selected, and trained officers were the same as a direct negligence claim against the City for the

same conduct.  See Court's Docket Doc. No. 57 at pp. 17-18, 35.  Since Plaintiff had again failed

to identify a statute that imposed a duty for a public entity to "non-negligently" hire, select, and

train employees, the Court dismissed the claim against Chief Dyer without leave to amend.[44]  See

id. at p. 18.  The active complaint, the Third Amended Complaint, as have each of the preceding

complaints, fails to identify a statute that imposes a duty on Fresno to not negligently hire, select

and train police officers.  See Court's Docket Doc. No. 87 at ¶¶ 41-42; cf. Munoz, 120

Cal.App.4th at 1112-13.  Consistent with the prior order dismissing this claim without leave to

amend (although styled against Dyer), Plaintiff's claim against Fresno is dismissed with

prejudice.  See Court's Docket Doc. No. 57; Munoz, 120 Cal.App.4th at 1112-13.

---

[44]The relevant claim in the Second Amended Complaint was the Fifth Cause of Action.  That claim was against Chief Dyer and Doe defendants for direct liability.  See Court's Docket Doc. No. 44 at p. 8.  The City was mentioned in the caption of the cause of action only for vicarious liability.  See id.  The Fifth Cause of Action contained no claim for direct liability against Fresno.  See id.

1      e.      Vicarious Liability

2          In part, California law provides, "A public entity is liable for injury proximately caused

3  by an act or omission of an employee of the public entity within the scope of his employment if

4  the act or omission would . . . have given rise to a cause of action against that employee . . . "

5  Cal. Gov't Code § 815.2(a).  However, "Where an employee is found not to have been negligent

6  there can be no vicarious liability."  Campbell v. Security Pac. Nat. Bank, 62 Cal.App.3d 379,

7  386 (1976); Davis v. Pine Mtn. Lumber Co., 273 Cal.App.2d 218, 227 (1969); see Niederreuther

8  v. Schiffer, 1998 U.S. Dist. LEXIS 11079, *6 (N.D. Cal. 1998).  Since the Court has found no

9  negligent conduct by the officers either in the use of the Tasers or in their post-struggle conduct,

10  Fresno has no vicarious liability for that conduct.  Summary judgment is appropriate.  See

11  Niederreuther, 1998 U.S. Dist. LEXIS 11079 at *6; Campbell, 62 Cal.App.3d at 386; Davis, 273

12  Cal.App.2d at 227.

13      f.      Claims Against Chief Jerry Dyer

14          Plaintiff names Chief Dyer as a defendant under her wrongful death, false imprisonment,

15  and negligence claims.  However, the evidence shows that the police officers on the scene were

16  Herring, Escareno, Brown, Burger, and Figueroa.  Chief Dyer was not present.  Accordingly,

17  summary judgment in favor of Chief Dyer on Plaintiff's wrongful death, negligence, and false

18  imprisonment claims is appropriate.

19

20                          **CONCLUSION**

21          The City of Fresno Defendants, that is Fresno, Herring, Escareno, Brown, Burger, and

22  Chief Dyer move for summary judgment on all claims against them.

23          With respect to the 42 U.S.C. § 1983 claim, Plaintiff has not presented evidence that

24  shows Michael's constitutional rights were violated.  Herring's use of the Taser was an

25  objectively reasonable means of trying to keep Michael and Lavette separated, given the totality

26  of the circumstances and particularly Michael's paranoia and agitation, Lavette's appearance and

27  conduct, and Michael's statements that the officers were not going to take Lavette from him.  All

28  further uses of the Taser by Herring, Escareno and Brown were also objectively reasonable due to

1   the totality of the circumstances, particularly Michael's resistance of the officers and the inability

2   of multiple officers to physically control Michael.  Alternatively, the law was not so clearly

3   developed that a reasonable officer in the Defendants' position would know that their conduct

4   was unlawful.

5          Additionally, the post-struggle conduct of the officers did not violate Michael's rights.

6   Paramedics had been summoned before the struggle ended; Michael was breathing and able to

7   talk with the officers after the struggle; when Michael fell over and said that he could not

8   breathe, the officers propped Michael back up and there is no indication that he continued to

9   complain; when the paramedics arrived Michael was breathing, communicated, and had a pulse;

10  the officers assisted the paramedics with placing Michael on the gurney and Michael was only on

11  his stomach a brief period of time during this process; when Michael was observed in distress by

12  Escareno, he informed the paramedics who examined Michael and said he was okay; and

13  Escareno and Burger helped with CPR and driving to the hospital.  The officers' conduct was

14  reasonable.

15         As to Plaintiff's *Monell* claim, since the officers did not violate Michael's rights, Fresno

16  has no liability for their conduct.  Alternatively, Plaintiff failed to show the existence of a policy

17  by Fresno that could form the basis of liability.  Summary judgment on Plaintiff's 42 U.S.C. §

18  1983 claims (the Second Cause of Action) is appropriate.

19         As to Plaintiff's negligence claims, the claim against the City for failing to adequately

20  train, select, and hire is dismissed with prejudice in accordance with this Court's prior rulings on

21  the Fresno Defendants' Rule 12(b)(6) motions.  Plaintiff's negligence claim relating to the use of

22  the Taser is a recapitulation of the 42 U.S.C. § 1983 excessive force claim.  The Court found the

23  officers' use of force to be objectively reasonable, and Plaintiff provided no additional evidence

24  or argument in defense of this claim.  Similarly, Plaintiff has not shown that the officers were

25  negligent in their post-struggle care and monitoring of Michael.  As discussed in the 42 U.S.C. §

26  1983 claim, when Michael complained that he could not breathe after falling over, the officers

27  propped him back up.  Paramedics had already been summoned and Michael was breathing when

28  they arrived.  After the paramedics arrived, Michael was under their care.  Summary judgment on

Plaintiff's negligence claims (the Fifth Cause of Action) is appropriate.

As to Plaintiff's false imprisonment claim, the totality of the circumstances show that the officers were legally justified in detaining Michael.  Summary judgment on this claim (the Eighth Cause of Action) is appropriate.

As to Plaintiff's wrongful death claims and battery claims (the First and Third Causes of Action), since the Court is granting summary judgment on the merits of Plaintiff's 42 U.S.C. § 1983 claims, summary judgment is also appropriate on these corresponding state law claims.

As to Plaintiff's intentional infliction of emotional distress claim, the conduct of the officers towards Michael was reasonable.  Plaintiff has failed to show the officers' conduct was sufficiently outrageous to support this tort.  Summary judgment on this claim (the Fourth Cause of Action) is appropriate.

Finally, with respect to Plaintiff's vicarious liability claim against Fresno, since the officers did not commit torts against Michael, there can be no vicarious liability against Fresno. Summary judgment on this claim (the Ninth Cause of Action) is appropriate.


Accordingly, IT IS HEREBY ORDERED that Defendants City of Fresno, Jesse Herring, Eloy Escareno, Richard Brown, Beau Burger, and Jerry Dyer's motion for summary is GRANTED.


IT IS SO ORDERED.

**Dated:     April 2, 2008**                                 _____/s/ Anthony W. Ishii_____
                                                                    UNITED STATES DISTRICT JUDGE